# Richmond

COUNTY OF YORK v. CITY OF WILLIAMSBURG.

COUNTY OF JAMES CITY v. CITY OF WILLIAMSBURG.

December 2, 1963.

Records Nos. 5608, 5609.

Present, All the Justices.

The opinion states the case.

*James N. Garrett* (*G. Duane Holloway, Commonwealth's Attorney; James N. Garrett, Jr.; Allen J. Gordon,* on brief), for appellant, County of York.

*Charles E. Ford* (*J. B. Cowles, Jr., Commonwealth's Attorney; Murray, Ford, West & Wilkinson,* on brief), for appellant, County of James City.

*Samuel H. Williams* and *V. M. Geddy, Jr.* (*Miss Mary Inman, City Attorney,* on brief), for the appellee.

WHITTLE, J., delivered the opinion of the court.

This is an annexation suit instituted by the city of Williamsburg against the county of York and the county of James City jointly. The suit resulted in annexation of certain territories in both counties. Writs of error were granted on petitions filed by each county separately.

After the filing of the petition for annexation by the city, both counties filed their answers and, among other things, denied the necessity for and expediency of annexation of any territory by the city. Thereupon, Judge Gus E. Mitchell, Jr. of the 34th Judicial Circuit, Judge Major M. Hillard of the 1st Judicial Circuit, together with Judge Robert T. Armistead, the resident judge, were designated to hear the case. After pre-trial conferences, a tour of inspection and views by the court of the territory sought to be annexed, the court heard the evidence of witnesses and on March 13, 1962 Judge Armistead announced that the court had decided to grant annexation of some of the territory sought by the city from each of the counties.

On May 15, 1962 the court entered its final order, together with its written opinion, allowing the annexation. Exceptions were taken to the order of the court by both counties and the city also filed cross-error to certain rulings.

The fact that the city of Williamsburg is financially able to care for the annexation involved is not disputed.

While the suit was instituted by the city against both counties, separate writs of error were granted each county and in reality two cases are here involved. Each will be treated separately in this opinion.

## COUNTY OF YORK v. CITY OF WILLIAMSBURG
### (RECORD NO. 5608)

Upon the filing of the suit the county of York filed an appearance denying the necessity and expediency of the annexation of any of its territory and as a further defense stated its belief that the proposed annexation of 5.94 square miles of its territory, if allowed, would reduce the remaining territory of the county after annexation below the 60 square mile statutory requirement (Code Section 15-152.6). Thereafter the court heard evidence on the area of York county and concluded that more than 60 square miles would be left in the event the proposed annexation was granted.

The court then proceeded to hear the case on its merits and after taking a view of the territory sought to be annexed determined in its final order to allow the city to annex .87 square mile, or 570 acres.

At the time of filing the suit the city of Williamsburg had within its corporate limits an area of 2.88 square miles.

The assignments of error filed by York county are nine in number and, according to the county, present three questions for decision, which will be taken up in the order presented.

The first is:

1. "Did the City prove that the annexation allowed was necessary and expedient?"

In its discussion of the law governing necessity and expediency York county argues before us that the city failed to carry its burden of proof, asserting that the evidence shows that the residents of the area were not seriously suffering any lack of services which the city could furnish. This argument was properly made before the annexation court but is not persuasive on appeal as the case comes before us upon the presumption that the finding of the annexation court is correct. The finding was:

"This Court is satisfied and hereby determines that the annexation herein provided for is both necessary and expedient, considering the best interests of James City County and York County, respectively, and the City of Williamsburg and the best interests, services to be rendered and needs of the area herein directed to be annexed, and

the best interests of the remaining portions of James City County and York County, respectively."

With this finding of fact we proceed upon the presumption of its correctness. Such finding is binding upon us unless the decision of the court is plainly wrong or without evidence to support it. If there is credible evidence to support the court's order we must on established principles accept it just as we accept a jury's verdict sustained by evidence which it might have believed. *County of Fairfax* v. *Town of Fairfax* (1959), 201 Va. 362, 366, 111 S. E. 2d 428, 432.

We said in *Falls Church* v. *Board of Supervisors*, 193 Va. 112, 119, 68 S. E. 2d 96, 100 "Aside from what the printed record discloses the annexation court, composed of able, experienced trial judges, heard the evidence *ore tenus*, they visited and studied the areas under consideration, saw the physical properties under the control of the city,—the streets, the schools, the library, the jail, the fire fighting equipment and had opportunity to observe and study the various other services allegedly furnished by the present municipal government. The Court then observed and studied the character of services which the citizens in the area sought to be annexed were receiving from the County of Fairfax and thus had opportunities for observation and study which are not afforded us."

Thus in this instance the burden rests upon York county to show by the record that the finding of the annexation court is without credible evidence to support it, or such finding is plainly wrong. Otherwise the finding must necessarily be affirmed.

 The record discloses that the city of Williamsburg is a small but vigorous and well managed city with an area of only 2.88 square miles. It provides and operates a modern and efficient police department, a fire department with ample equipment manned by paid personnel and by volunteers, a full time garbage and trash disposal service, an adequate and sufficient water and sewer system, and an excellent system of streets, a recreation program participated in by many residents of York county, a school system operated jointly with James City County and in some respects superior to the York County system. In addition, the city has land development and zoning controls designed to protect and foster the type of development deemed most important by its citizens.

The principal commercial interest of the city is the restoration project of Colonial Williamsburg which attracts approximately

1,000,000 visitors each year. It is conceded that this unique restoration project provides the economic reason for most of the business activity in the area. The acquisition of lands for the restoration has made necessary the removal of existing buildings and the creation of extensive greens, gardens, vistas and thoroughfares which are in no sense available for modern residential or commercial development.

The Williamsburg Restoration owns 334 acres within the present city limits; the College of William & Mary owns 305 acres; the Eastern State Hospital owns 70.75 acres. None of these properties is available for residential or commercial use. Thus it is virtually impossible to acquire residential property within the city. The record further discloses that during the past ten years only 18 residential building lots were plotted in the city while 471 such lots were plotted in the nearby areas of the counties. In the annexation area of York County numerous businesses have developed for serving the many visitors to the restored city.

The principal annexation area embraces the Colonial Williamsburg Information Center and Motor House, the East Williamsburg Subdivision, Route 168, Capitol Landing Road, part of By-Pass Road (Route 60) and Route 162. Embraced in the area are residential properties, commercial areas and a large undeveloped tract owned by Colonial Williamsburg.

York County does not question that a close community of interest exists between the city and the area sought to be annexed.

We do not deem it necessary to detail the services which the city will supply to the annexed territory. Suffice it to say that the record discloses, and the annexation court found as a fact, that the area or territory to be annexed is an integral and homogeneous part of the Williamsburg community, enjoying a strong community of interest with the city in its civic, social and business life, fully urbanized, with business and residential development directly attributable to the economic and social activities located within the corporate limits.

Furthermore, it is disclosed, as was found by the annexation court, that the area ordered to be annexed lacks in large part the essential municipal facilities which will be supplied by the city, thus benefiting its inhabitants by providing better and cheaper fire protection, water and sewer service, trash and garbage collection, more harmonious zoning regulations, more convenient schools with better teachers, and lower costs for fire insurance, sewer and water service.

The county does not seriously contend that it was not in the best

interests of the remaining portion of the county that the annexation decreed by the lower court be allowed. The record is clear that the annexation of the area to the city of Williamsburg will relieve the county of the necessity of providing sewer and water or other urban services to the area. To the extent that the county is relieved of such obligations, it is obvious that it will have additional funds with which to provide such services, if desired, in other parts of the county.

We are of the opinion that the decision of the annexation court finding that the annexation of that portion of York county allowed by the court was expedient and necessary and in the best interests of the city, the county and the annexed area is fully supported by credible evidence and the ruling is therefore sustained.

The second question raised by the county is stated as follows: 2. "Even if necessity and expediency for some annexation has been proven by the City, did the Court err in fixing the boundaries of the territory allowed for annexation?"

The question deals with the court's exclusion of that part of the territory sought by the city for annexation known as the Highland Park area. The city in its ordinance designated Highland Park as a part of the territory which it desired taken into the corporate limits. After the court made it known that it would not grant to the city all the territory sought in the vicinity of Highland Park, the city changed its position and sought to have Highland Park excluded.

It appears that the court's fundamental reason for the exclusion of Highland Park was that this area is largely undeveloped and it would be expensive for the city to serve; that a pumping station would be necessary to take care of the sewerage in this area, which would be costly. The court's reason for excluding this subdivision in light of the record is not convincing. Geographically Highland Park is but an extension of Henry Street from the city. It is adjacent to Colonial Williamsburg Information Center and approximately 82% of all employed persons in Highland Park are employed within the city limits. The testimony of the city's own witnesses and exhibit No. 57 disclose that this property should have been included in the annexation.

Dr. H. M. Stryker, Mayor of the city, was offered as a witness and testified on direct examination concerning Highland Park as follows:

Q. "Now directing your attention to the Highland Park Subdivision, why did you include that?"

A. "Well, I don't see that we could have excluded it. We asked for the other, we might as well be fair about it. It's one body of land. You couldn't run the line around there and separate it."

Q. "Are any City services furnished to that area now?"

A. "Yes, water is furnished there."

The city offered A. E. Kendrew, Chairman of the City Planning Commission, who testified as follows:

Q. "Directing your attention to the area south of By-pass Road and north of the present City limits which end in York County, will you tell why the City Council included that [Highland Park] in the annexation property?"

A. "We considered that the first property desirable or which had the highest priority because it is so close to corporate limits and the corporate limits somewhat embrace it. From another point of view, it was not too desirable because of some of the development that has taken place there but the Planning Commission feels that there may be an opportunity under City control and direction to improve properties there and make them more desirable from the financial basis. In addition to that, there are—there are several pieces of property that are vacant and would offer possibilities of future development of a varied nature if it were brought into the City."

R. C. Walker, Vice Chairman of the City Planning Commission, testified:

Q. "All right, sir. Moving now to the Bypass Road area itself, between the railroad tracks and Route 132, what was your reason for including that?"

A. "Well, the Bypass Road itself is built up with residences. There are one or two businesses on that road. The people are—for a large part are interested in some way in Williamsburg activities. The section to the south (indicating), this section here is Negro development called Highland Park. It was not desirable from an income standpoint but there again the—the City or Planning Commission realized we couldn't ask for the area around and leave Highland Park out."

Martin Johnson, the principal expert witness offered by the city testified concerning Highland Park " * * * There is a very important subdivision in this section called Highland Park and it's—entrance until Route 162 was built, was entirely dependant on Henry Street connection extension to the north from the city unto the area. Highland Park is a large, relatively large subdivision; almost entirely

colored people, the majority of which I understand work inside of the city and a good many for the Restoration." Johnson further testified "This area, the brown area is part of the tract of land that was cut in two that belonged to the Colonial Williamsburg and it was cut in two by the Route 132 and this area called Highland Park is served by city water and we consider it completely urbanized in view of the fact as laid out into more or less small residential lots; numerous houses in it. City water is extended into it and the proposed improvements in that area by the city and placing larger lines into the area, larger water lines to provide adequate fire protection."

The exhibits show that Highland Park is an area closest to the heart of the city and is adjacent to the valuable and heavily frequented Information Center. It is an area that all city experts contended should be included in any annexation granted by the court. From the evidence of the city's own witnesses and exhibits filed, we are of the opinion that it was error for Highland Park to be excluded.

The third question posed by the county is stated as follows: 3. "Did the Trial Court err in its failure to require the City to assume a just proportion of the school bond issue of August 8, 1961?"

This question deals with a $1,250,000.00 school improvement bond issue sold on August 8, 1961 by the county.

The court after stating that it proposed to grant some annexation to the city, without warning, made the following observation:

"We feel that before we go into financial data we would facilitate matters greatly if we made certain rulings basically questions of law. If you knew what those rulings are before you attempted to compute your financial loss, that everyone would be better off. For that reason we have considered these matters * * * . Now the next thing is the York County bonds [school improvement bonds $1,250,000]. We feel they should not be included in the city. I believe there's a million and a quarter dollars. They were not voted until last August. At that time the case was scheduled—first, it was to be heard in June. It was postponed until September and during that interval the bonds were sold and voted and sold in August. We think it's the usual practice not to vote a bond issue and just keep the money in the bank. I think at this time they're only committed for several hundred thousand dollars of the whole million and a quarter. That if we permitted that to be done, that the County could virtually prohibit annexation by voting millions and millions of dollars of bonds and keeping the money in the bank and as soon as the annexation pro-

ceeding is over, take the money out of the bank and pay the bonds out. We think the bonds issued at that time should not be included in the proportion of the debt that Williamsburg would have to assume."

The court again commented on its reasons for its failure to require the city to assume a just proportion of the debt in its opinion which read as follows:

"On August 8, 1961, the County of York sold bonds having a face value of $1,250,000.00. Most of the proceeds are still in the bank, only a small portion having been expended. This bond issue was not voted on until after the annexation proceedings were instituted and if it had not been for the illness of one of the Judges, the matter would have been disposed of before they were issued. Obviously, the indebtedness should not be included."

It was agreed by both sides to this litigation that the ratio of the bonded debt of the county to be assumed by the city would be 3.078%. Dollarwise, under this formula, the principal amount of debt that the city should have been required to assume would amount to $38,475.00, arrived at by applying the 3.078% x $1,250,000.00.

We do not agree with the reasoning of the court in this instance. We hold that it was error not to require the city to assume a just proportion of the bond issue of August 8, 1961.

It is conceded that York county duly issued and sold the $1,250,-000.00 in school improvement bonds; that the said bond issue is clearly a debt of the county; and that said debt is presently existing. It is further undisputed that a substantial portion of the bond money, to-wit: $422,129.00 had already been expended or pledged in connection with the public schools of York county prior to March 8, 1962 and that the remaining balance of the receipts of said bond issue was scheduled to be expended for the construction of additional schools needed in the county.

Apparently the court felt that the sale of bonds during an annexation proceeding was an improper or questionable act. Title 15 of the Virginia Code has no such prohibition. The only restraint is imposed by Section 15-152.3 which prohibits the contracting for permanent public improvements between the date of the entry of the order of annexation and the date such order becomes effective. Under these circumstances the consent of the city must be obtained if it is expected to pay any part of the debt.

If we should adopt the ruling of the annexation court in this in-

stance, the ordinary processes of county government would grind to a halt upon the institution of an annexation suit. Furthermore, potential purchasers of county school bonds issued during the pendency of an annexation proceeding would be vitally affected if the fiscal picture of the borrowing county could be changed by annexation and the security for the bonds thus reduced.

We have been cited to no case, nor have we found one, where an annexation court has failed to require a city to assume a just proportion of a county's debt under circumstances such as those existing here. Clearly there can be no balancing of equities as directed by Code Section 15-152.12 unless the city is required to assume its just proportion of this debt. The statute contemplates such assumption and the city will be required to conform.

When these bonds were sold, they became a lien on all county property and the bondholders were entitled to that lien unaffected by any annexation order which might be entered. Such order should not have the effect of removing valuable property as security for an existing debt.

The final question for determination in this case involves the cross-error filed by the city which reads:

"The court erred in awarding compensation to York County for prospective loss of net tax revenue in excess of the amount testified to by expert witness for the city."

On trial York county claimed a loss of $222,885.00, while the city claimed the county's loss would be zero. The court allowed the sum of $110,000.00, stating that the county would lose $27,000.00 from the first year's income and that considering the expense of educating children living in the area and of some governmental expenses which it would be spared, the court decided, "The best we could come to as a loss for the first year would be $18,000, $20,000 for the second year, $22,000 for the third year, $24,000 for the fourth year, and $26,000 for the fifth year."

The pertinent portion of Section 15-152.12 of the Code which authorizes an annexation court to award such compensation reads as follows:

"(C) To require the payment by the city of a sum to be determined by the court, payable on the effective date of annexation, to compensate the county for the value of public improvements, including but not limited to the paving of public roads and streets, the construction of sidewalks thereon, the installation of watermains, or

sewers, garbage disposal systems, fire protection facilities, bridges, public schools and equipment thereof, or any other permanent public improvements owned and maintained by the county at the time of annexation; *and further to compensate the county in not more than five annual installments for prospective loss of net tax revenues during the next five years, to such extent as the court in its discretion may determine, because of annexation of taxable values to the city."* (Emphasis supplied)

It is clear that this statute leaves to the discretion of the trial court (a) whether such compensation shall be allowed and (b) the extent of such allowance because of annexation of taxable values to the city.

It is undisputed that $1,377,765.00 of taxable values would be taken from York county under the proposed order; of which 77.3% consists of commercial, industrial and public service properties, which properties did not require the usual commensurate revenue expenditures.

The city apparently insists that the court was bound as a matter of law to accept the testimony of the city expert to the effect that there would be no resulting loss of tax revenue to the county. Such an assumption is incorrect. We recently said in the case of *City of Roanoke* v. *County of Roanoke, et al.,* 204 Va. 157, 168, 129 S. E. 2d 711, 718 "We do not agree that the court was bound by the testimony of either expert witness in response to the hypothetical questions posed by the court. The court had a right to accept this testimony or reject it. It was for the court to decide what weight should be given their expert testimony."

The city's argument on this point is to the effect that we should adopt the "growback" theory in Virginia. It is stated in the city's brief "This entails a showing of the County's prior experience and growth in assessables, which rate of growth is projected and its return to pre-annexation level is thus ascertained. This is the principle which the city has referred to as 'growback' ".

It is contended by the city that the case of *Henrico County* v. *City of Richmond,* 177 Va. 754, 789, 15 S. E. 2d 309, 321 is controlling authority for its contention that annexed values will necessarily be replaced by county expansion following the annexation. It also relies upon Mr. Justice Spratley's opinion in the case of *City of Lynchburg* v. *Campbell County* reported in 11 Va. L. Reg. (N.S.) 400. Neither of these cases acknowledged or adopted the growback

theory as the law of Virginia. They merely acknowledged that a considerable loss of revenue to the county results from nearly every annexation case, but that such loss would not be grounds for denying an annexation. Neither did these cases have under consideration Section 15-152.12 (c) of the Code which expressly allows an annexation court to fix compensation for the loss of revenue. Certainly neither case held as a matter of law, that counties always recoup tax losses in all cases even before a proposed order of annexation becomes effective. If such were true, Code Section 15-152.12 (c) could have no possible meaning or application.

The so-called "growback" theory advocated by the city is based entirely upon speculation and conjecture. The county's assessables may or may not increase after annexation, no one can prophesy as to this. If the assessables do increase, such "growback" belongs to the county and not to the city. Code Section 15-152.12 (c) is designed to require the city to pay the county for revenue based on the land taken and vests the annexation court with discretion in determining the amount the city shall pay. The presumption of correctness which attaches to the decision of the annexation court in other instances applies with equal force to this facet of the case and we find no error in the decision. Therefore, the cross-error is overruled.

For the reasons stated the order of the annexation court is affirmed in part and reversed in part as herein indicated and the case is remanded for a revision of the order so that it will conform to the views here expressed. And whereas the order appealed from provides "This Decree shall become effective at midnight on December 31, 1962"; in view of the suspension of the order pending this appeal, the order will be amended to provide that it will take effect at midnight on the 31st day of December, 1963. *Henrico County* v. *City of Richmond, supra,* 177 Va. 754, 805, 15 S. E. 2d 309, 328.

*Affirmed in part and reversed in part and remanded.*

SPRATLEY and I'ANSON, JJ., dissenting.

## COUNTY OF JAMES CITY v. CITY OF WILLIAMSBURG
## (RECORD NO. 5609)

Upon the filing of the suit the county of James City filed an appearance denying the necessity and expediency of annexation of any territory. The proceedings in this case, of necessity, followed

the proceedings in the York county case. The court ordered the annexation of three principal areas of the county. These were the Skipworth Farms and Richmond Road area, the Walnut Hills and Jamestown Road area, and the trailer court area at the eastern end of the city.

The Richmond Road area consists of a substantial and thoroughly urbanized commercial section north of the city limits. The record discloses that the level of development in the annexation area is such that it is impossible for one to tell when he leaves the city and enters the county. To the north of this area is a residential development of Skipworth Farms. To the south and west of this tract lie the College of William & Mary and the Dunbar Farm of Eastern State Hospital, both owned by the Commonwealth, neither of which is available for development.

This area at present is served by water and sewer from the city and fire protection is also provided. No services other than minimum police protection, street lights and public education are provided by the county. The area is not zoned and has no subdivision control ordinance. It is conceded that there is a close community of interest with the city both in residential and business aspects.

The record further discloses that the area designated Jamestown Road and Walnut Hills lies to the southwest of the city limits and embraces entirely residential property, a part of which has been platted and developed into a residential area. The larger part is relatively undeveloped and offers growth space for the city.

The residential area lying west of Jamestown Road in the Walnut Hills and Richneck Heights Section is completely urbanized, being divided into residential building lots enjoying the city's water service. Here no services other than public education and police protection are supplied by the county and this area is also without the protection of zoning and subdivision ordinances. Further, the area enjoys no central sewerage facilities.

The Geddy property is undeveloped, but embraces a tract of land eminently suitable for residential development. On this land is situated a water tower belonging to the city. It is disclosed that this property is undergoing preliminary studies looking to its development in the reasonably near future and will furnish the city with additional growth space. Only half of this property was included within the annexation area while the city asked for the entire tract, as did the landowner.

The Jamestown Road area enjoys the greatest community of interest with the city of any of the areas allowed for annexation. Many of the civic leaders of the city reside in this area and it is here that younger families coming to Williamsburg are moving, having been forced to settle in the area because of the lack of available residential property within the present city limits.

The effect of these areas being annexed to the city will assure the inhabitants thereof that fire insurance rates will be greatly reduced, the costs of water and sewer connections and services will be reduced by one-third or more, and the provisions of the order of the lower court will assure that such services are made available throughout the area.

In the trial court the city had the burden of demonstrating to the court "necessity and expediency", considering the "best interests" provisions of the statute. This task was accomplished to the satisfaction of the trial court which, in its written opinion, has announced its conclusion that necessity and expediency exist, considering the "best interests" aspects of the statute.

Since the trial court has so found, the case now comes before us with a different presumption and a different burden of proof. The situation now existing is that the conclusion of the trial court is presumed to be correct and the burden of proof is upon the appealing county to demonstrate that this conclusion was plainly wrong or without evidence to support it. *County of Fairfax* v. *Town of Fairfax, supra*, 201 Va. 362, 366, 111 S. E. 2d 428, 432.

There was no exception taken to the conclusion of the annexation court that a community of interest exists between the inhabitants of the area annexed and the city, nor does the county question the financial ability of the city to provide for development after annexation.

The record further shows that James City county is a rapidly growing jurisdiction. The population has increased from 6,317 in 1950 to 11,539 in 1960. Most of this growth and development has occurred in Jamestown Magisterial District, which adjoins the city of Williamsburg. This district contains approximately 75% of the population of the county and more than 75% of the assessed valuation of all property.

The county has no zoning ordinances or subdivision controls. It provides no trash or garbage collection, such collection service being provided by private contractors, which is not satisfactory. Sewer and

water services provided to portions of the county embraced within the annexation area are all furnished by the city. Both the Richmond Road and Skipworth Farms areas enjoy city sewer and water services.

The 148 square miles of James City county are presently policed by a sheriff with two deputies, with aid from the state police. Fire protection to the Jamestown district, which embraces the annexed area, is furnished by the city fire department pursuant to a contract with James City county. The county itself has no fire fighting facilities within the annexation area and pays no hydrant rental for the hydrants provided by the city along its water lines.

The county operates no recreational program for its young people, but contributes annually $500.00 to the city for the operation of its program. Of the 1,319 participants in the city recreation program, 34% were from the city and 48% from the county, the remainder coming from York county. This recreation program costs the city $7,110.00, while the county pays $500.00 despite its 48% participation.

We are of the opinion that the annexation court properly found that the city had carried the burden of proof in showing the necessity for and expediency of annexation of the territory granted by the court and that such annexation would be to the best interests of all parties concerned.

There is no merit in the county's contention that the Skipworth property should be excluded from the territory to be annexed. There is ample credible evidence to support the decision of the court that this well developed area should be within the corporate limits of the city. Neither is there merit in the county's contention that the court should have included in the territory to be annexed that part of the territory known as the Ironbound Road area. This property was not requested by the city and no good reason has been advanced as to why it should have been included. The annexation court viewed the property surrounding the city and in this instance is in a better position than we to determine what should come in and what should be left out.

There are three remaining questions for decision, all of which involved cross-errors filed by the city.

The first of these, says the city, is as follows: "The lower court unconstitutionally impaired the obligation of the joint school contract [between the county and the city] by requiring that school

construction costs be shared in a manner different from that provided in said contract."

In this connection the annexation court required the city to pay its proportionate share of the cost of new construction of schools under the joint school contract as a condition of annexation. This ruling took under consideration the increase in the number of pupils transferring from the county to the city because they resided in the annexed area. The court further found that in consideration of annexation the cost:

"shall be determined by the pupil increase in the joint school system from James City County and from the City of Williamsburg from December 1, 1957, (the last construction having been made in 1958) to on or about December 1, 1962, when the annual school census for the current year is taken. To determine the pupil increase from each jurisdiction there shall be added to the City all pupils residing in the annexation areas of both York and James City Counties and deducted from James City County all pupils residing in the area annexed from James City County."

By this decision the court was attempting to "balance the equities" as provided by Code Section 15-152.12.

Further, the court was doing nothing more than was requested by counsel for the city. When dealing with this question counsel stated: "We feel should the court allow annexation of all or part of this land that's being sought, that the court *could and should, as part of its order of annexation,* spell out the obligation upon—upon James City and the City of Williamsburg to expand the schools *if the court feels* that the expansion proposed by the School Boards is necessary and *should be a condition of annexation.* In other words, we feel this court has all of the figures. It has the contract itself before it and *we would ask this court and we're perfectly willing to abide by the results that this court decrees so far as sharing in the cost of these school expenditures."* (Italics supplied)

Thus counsel for the city placed the interpretation of the contract upon the court, to determine its terms and decide the question between the parties in the light of the changed condition. This the court did and we hold its decision was proper. The contract did not have annexation in contemplation at the time it was consummated and of course the annexation changed the picture. It was the court's duty under the statute to balance the equities between the parties and,

enter such order as "it deems fair and reasonable" under the conditions then existing. The cross-error is overruled.

The next assignment of cross-error filed by the city reads: "The court erred in awarding compensation for loss of net tax revenue in excess of the amount testified to by an expert witness for the city".

Much of the argument in the preceding question applies here and the same law applies. Section 15-152.12(b) provides that the annexation court shall have the power "to require the assumption by the city or town of a just proportion of any existing debt of the county or any district therein".

When the matter of non-assumption of any part of the existing school bonds was broached, counsel for the city took the position that because the total amount of the bond issue, $600,000.00, went toward the construction of the new James Blair High School, which was then under the school contract, between the county and city, but was to be owned one-half by the city and one-half by the county, that the city should not have to take over any part of the outstanding and unpaid portion of the bond issue.

In passing on this question Judge Armistead made the following observation:

"Now let's look at it from the standpoint of accounting, from the people that loan the money. The County voted for the bond issue. Assuming they had "X" dollars in assessable property and the people I presume loaned the money on the same basis. Now, what difference does it make to them where the money went. In other words, if you are going to take ten percent of this assessed value isn't the theory of this based not on what the money was used for but rather for the fact that the *bond issue was originally voted on the basis of certain value of the assessed property and when this is reduced, it's only fair that the debt be reduced proportionately.*" (Italics supplied)

Whereupon the court held "That the said school bonds of 1953 be reckoned as a portion of the public indebtedness of James City County and as such be assumed in part by the City of Williamsburg as a result of annexation."

The other assignments of cross-error have been dealt with in the York County case where we refuse to adopt the "growback" theory contended for by the city. All cross-errors are overruled and the

order of annexation is affirmed with the effective date thereof being changed to midnight on December 31, 1963.

*Affirmed and remanded.*

SPRATLEY, J., dissenting in part.

I cannot subscribe to that portion of the majority opinion in the case of *County of York* v. *City of Williamsburg*, Record No. 5608, which holds that the city should assume 3.078% of $1,250,000.00 school bonds issued by the county of York on August 8, 1961, more than one year after these proceedings were instituted.

The record shows that at the date of the final order of the trial court, May 15, 1962, only the sum of $422,129.00 of the proceeds of the said bond issue had been expended, or pledged to be expended. The remaining $827,871.00 was then deposited in a bank to the credit of the county, presumably bearing interest at the current rate. It can be used for improvements in the remainder of the county, as proposed in the bond issue, or to curtail the indebtedness created by the issue. If expended in the county, it will furnish to that extent additional security to the bondholders. If left on deposit, it may produce a greater return than the interest charged on the bonds, considering that current interest rates on municipal securities are generally lower than rates paid by many banks on saving accounts.

At any rate, the bank deposit is an asset of the county sufficient to pay an equal amount of the indebtedness created by the bond issue, or an offset of liabilities to an equal extent.

Neither the annexed area nor the city will share in any portion of the balance on deposit. None of it will be expended in the annexed area lost to the county by annexation. Neither the city nor the annexed area will get any benefit therefrom.

The facts show that the issue of the bonds after these proceedings were begun was a questionable act. Although an issue of bonds under a like situation is not specifically prohibited by statute, there is a statute which directs that an annexation court "in making its decision, shall balance the equities in the case," Code, § 15-152.12, in requiring the annexing city to assume "a just proportion of any existing debt of the county or any district therein." Code, § 15-152.12 (b).

Under a somewhat similar situation, we held in *County of Fairfax* v. *Alexandria*, (1951) 193 Va. 82, 94, 68 S. E. 2d 101, that the an-

nexing city should be required to assume only that portion of an existing bonded indebtedness of the county which remains after the exclusion of expenditures proposed to be made in the area annexed; but which for some reason have not become necessary, and also the exclusion of certain revenues collected by the county in the area about to be annexed.

Also, see *Norfolk County* v. *Portsmouth*, (1919) 124 Va. 639, 98 S. E. 755, where we said:

"* * * (I)t would be inequitable to hold that that portion of the county and its people embraced in the annexation aforesaid must carry with them a part of the burden of such indebtedness, when they cannot carry with them the benefit of any part of the security therefor in which they formerly had an interest."

It seems to me inequitable and unjust to burden the residents of the annexed area and the city with a portion of an indebtedness from which they will receive no benefit; while the county retains the proceeds for further development of the county, or as a possible investment.

At most, I think the city of Williamsburg should be required to assume only 3.078% of the sum of $422,129.00, the amount expended, or pledged to be expended, at the time of the final order of the trial court.

Any other conclusion will be a violation of the letter and spirit of Code, § 15-152.12; and, perhaps, an invitation to a county when a portion of its territory is sought in an annexation proceeding, to immediately issue bonds in an amount calculated to deter a city or town from prosecuting an annexation proceeding.

I am otherwise in accord with the reasoning and conclusion of the majority opinion in the *County of York* case.

I'ANSON, J., joins in this dissent.